# UNITED STATES DISTRICT COURT
for the
District of Colorado

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
1530 Wabash Avenue, Pueblo, CO 81004 more fully described in Attachment A, attached hereto, to include all out-buildings and ~~vehicles located thereon~~ and to include the person of any residents present at the address at the time of the search warrant execution

)
)
)
)
)
)
)
)

Case No. 19-sw-06080-NYW

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the __State and__ District of __Colorado__ *(identify the person or describe property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

X evidence of a crime;

X contraband, fruits of crime, or other items illegally possessed;

X property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of __18__ U.S.C. § 247, and the application is based on these facts:

X Continued on the attached affidavit, which is incorporated by reference.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/ John W. Smith*
*Applicant's signature*

John W. Smith, Special Agent
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: **01 Nov 2019**

*[signature: Nina Y. Wang]*
*Judge's signature*

Nina Y. Wang
United States Magistrate Judge
*Printed name and title*

City and state: Denver, CO

## ATTACHMENT A

## DESCRIPTION OF LOCATION TO BE SEARCHED

The Subject Premises is located at **1530 Wabash Avenue, Pueblo, Colorado 81004.**  The Subject Premises is more particularly identified as a single family home with blue masonry style siding.  The numbers "1530" are written above the front steps**.**  The location consists of the subject residence, surrounding property, and all outbuildings located thereon.  The place to be searched includes the person of any residents present at the address at the time of the search warrant execution.



1

**ATTACHMENT B**

### **DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED**

The following items, located within the Subject Premises, further described in Attachment A, that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of Title 18, United States Code, Section 247 (Damage To Religious Property; Obstruction Of Persons In The Free Exercise Of Religious Beliefs) [hereinafter "Subject Offenses"], including the following:

1. Weapons, to include, but not limited to, firearms and knives;

2. Explosive devices and materials, to include items that could be utilized to produce explosive devices;

3. Items that could be used to make/produce weapons;

4. White Supremacy paraphernalia, including but not limited to writings, clothing, books, flags, posters, and patches.

5. Masks or costumes designed to disguise a person's identity;

6. Arsenic or any substance containing arsenic;

7. Indicia of ownership and/or residence of the Subject Premises;

8. Images, videos, visual images and depictions relating to the Subject Offenses and/or showing intent or plans to commit acts of violence, damage religious property or forcefully obstruct free exercise of religion or evincing hatred or bias against individuals or groups of individuals due to their actual or perceived race, color, religion, or national origin;

9. Any and all records, information, notes, software, documents, records or correspondence, in any format and medium relating to the Subject Offenses and/or showing intent or plans to commit acts of violence, damage religious property or forcefully obstruct free exercise of religion or evincing hatred or bias against individuals or groups of individuals due to their actual or perceived race, color, religion, or national origin;

10. Any and all information, notes, documents, records, or correspondence, in any format or medium, concerning Internet activity relating to the Subject Offenses and/or showing intent or plans to commit acts of violence, damage religious property or forcefully obstruct free exercise of religion or evincing hatred or bias against individuals or groups of individuals due to their actual or perceived race, color, religion, or national origin;

11. Any and all address books, names, and lists of names and addresses of individuals who may have been contacted by use of the Subject or by other means for the purpose of committing violations of the Subject Offenses;

12. Any and all information, notes, documents, records, or correspondence, in any format or medium, concerning membership in online groups, clubs, or services that teach, guide, direct, advise or otherwise participate or advocate for violations of the Subject Offenses and/or showing intent to commit acts of violence, damage religious property or forcefully obstruct free exercise of religion or evincing hatred or bias against individuals or groups of individuals due to their actual or perceived race, color, religion, or national origin;

13. Any and all information, records, documents, invoices and materials, in any format or medium, that concern any accounts with an Internet Service Provider pertaining to violations of the Subject Offenses and/or showing intent to commit acts of violence;

14. Any and all information, records, documents, invoices and materials, in any format or medium, that concern e-mail accounts, online storage, or other remote computer storage pertaining to violations of the Subject Offenses and/or showing intent to commit acts of violence, damage religious property or forcefully obstruct free exercise

of religion or evincing hatred or bias against individuals or groups of individuals due to their actual or perceived race, color, religion, or national origin;

15. Records of Internet activity, including Internet Protocol addresses, firewall logs, transactions with Internet hosting providers, co-located computer systems, cloud computing services, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms pertaining to violations of the Subject Offenses and/or showing intent to commit acts of violence, damage religious property or forcefully obstruct free exercise of religion or evincing hatred or bias against individuals or groups of individuals due to their actual or perceived race, color, religion, or national origin;

16. Any and all information, documents, records, photos, videos, or correspondence, in any format or medium, pertaining to use or ownership of the Subject Phone, or that aid in the identification of persons involved in violations of the Subject Offenses;

17. Credit card information, bills, and payment records pertaining to violations of the Subject Offenses;

18. Descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of the Subject Offenses;

19. Evidence of who used, owned, or controlled the Subject Phone to commit or facilitate the commission of the crimes described, or at the time the things described in this warrant were created, edited, or deleted, including photographs, videos, logs, call logs, phonebooks, address books, contacts, IP addresses, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, search terms, metadata, user profiles, e-mail, e-mail contacts, messages (text or voice), instant messaging logs, file structure and correspondence;

20. Evidence of software that may allow others to control the Subject Phone, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security provisions or software designed to detect malicious software or unauthorized use of the device, and evidence of the lack of such malicious software;

21. Evidence of the attachment to the Subject Phone of other storage devices or similar containers for electronic evidence;

22. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Subject Phone;

23. Evidence of how and when the Subject Phone were used or accessed to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

24. The telephone number, ESN number, serial number, and/or SIM card numbers of or contained in the Subject Phone;

25. Passwords, encryption keys, and other access devices that may be necessary to access the Subject Phone; and

26. Contextual information necessary to understand the evidence described in this attachment.

27. Any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to the Subject Offenses;

28. Information about usernames or any online accounts or email addresses.

29. Computer(s), digital storage media, or digital storage devices, any physical object upon which computer data can be recorded, computer hardware, computer software, servers, computer related documentation, computer passwords and data security devices, gaming devices, tablets, flash drives, volatile data, digital communications

devices, cellular telephones, cameras, videotapes, video recording devices, video recording players, and video display monitors, digital input and output devices such as keyboards, mouse(s), scanners, printers, monitors, electronic media and network equipment, modems, routers, connection and power cords, and external or connected devices used for accessing computer storage media that was used to commit or facilitate commissions of the Subject Offenses.

30. For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, COMPUTER) that is called for by this warrant, or that might contain items otherwise called for by this warrant relating to the Subject Offenses:

    a. evidence of who used, owned, or controlled the COMPUTER at the time the items described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, user profiles, e-mail, e-mail contacts, "chat" or instant messaging logs, photographs, and correspondence;

    b. evidence of software that may allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the lack of such malicious software;

    d. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

    e. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

    f. evidence of how and when the COMPUTER was used or accessed to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

    g. records of or information about Internet Protocol addresses used by the COMPUTER.

    h. information about usernames or any online accounts or email addresses.

    i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

    j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

    k. contextual information necessary to understand the evidence described in this attachment;

    l. volatile data necessary to preserve evidence prior to powering-off and unplugging a running computer;

    m. any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to the Subject Offenses;

    n. items otherwise described above in paragraphs **1-28** of this Attachment B.

    o. Executing law enforcement personnel are authorized to depress the fingerprints and/or thumbprints of persons reasonably believed to be the user(s) of the Device onto the fingerprint sensor of any Apple iPhone, iPad, or other Apple brand device, or other device that has a fingerprint sensor, in order to gain access to the contents of any such device. Law enforcement personnel may also depress the fingerprints and/or thumbprints of persons reasonably believed to be the user(s) of the Device in order to gain access to applications on the device that may be locked with a fingerprint or thumbprint.

DEFINITIONS:

31. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

32. As used above, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

# AFFIDAVIT

I, John W. Smith being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent of the Federal Bureau of Investigation (FBI), and have been since March 4, 2004. As part of my duties, I investigate criminal violations relating to terrorism, civil rights, and online threat communications. I have received training and instruction in the field of investigation of these criminal violations and have had the opportunity to participate in investigations relating to terrorism, civil rights, and online threat communications. As part of my training and experience, I have participated in investigations involving electronic evidence, emails, text messages, and the Internet.

2. This affidavit is submitted in support of an application for a search warrant for the place described in Attachment A (hereinafter "Subject Premises,"), and the computer(s) located therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 247 (Damage To Religious Property; Obstruction Of Persons In The Free Exercise Of Religious Beliefs).

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 247 are presently located at the Subject Premises.

4. The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

## TECHNICAL TERMS

5. Based on my training and experience, I use the following technical terms to convey the following meanings:

6. "IP Address" means Internet Protocol address, which is a unique numeric address used by computers on the Internet. Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

7. "Internet" means a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

8. In this affidavit, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

**SEIZURE AND SEARCH OF COMPUTERS**

9. As described above and in Attachment B, I submit that if computers or storage media are found at the Subject Premises**,** there is probable cause to search and seize those items for the reasons stated below. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis. They may be seized and searched on-scene, and/or searched off-scene in a controlled environment.

10. For example, based on my knowledge, training, and experience, I know that a powered-on computer maintains volatile data. Volatile data can be defined as active information temporarily reflecting a computer's current state including registers, caches, physical and virtual memory, network connections, network shares, running processes, disks (floppy, tape and/or CD-ROM), and printing activity. Collected volatile data may contain such information as opened files, connections to other computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed. Volatile data and its corresponding evidentiary value is lost when a computer is powered-off and unplugged.

11. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

12. Also, again based on my training and experience, wholly apart from user-generated files, computer storage media contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, virtual memory "swap" or paging files, and shadow copies of previous versions of systems or files, or paging files. Computer users typically do not erase or delete this evidence because special software is typically required for that task. However, it is technically possible to delete this information. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted, edited, moved, or show a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

13. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, why they were used, the purpose of their use, and the purposes to which they were put, who used them, the state of mind of the user(s), and when they were used.

14. The monitor and printer are also essential to show the nature and quality of the images or files that the system can produce. In addition, the analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other

documentation and security devices.  Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

15. The computer and its storage devices, the mouse, the monitor, keyboard, printer, modem and other system components are also used as instrumentalities of the crime to operate the computer to commit the offenses discussed in this affidavit.  Devices such as modems and routers can contain information about dates, IP addresses, MAC addresses, frequency, and computer(s) used to access the Internet or to otherwise commit the crimes described herein.  The computer equipment may also have fingerprints on them indicating the user of the computer and its components.

16. Similarly, information or files related to the crimes described herein are often obtained from the Internet or the cellular data networks using application software which often leaves files, logs or file remnants which would tend to show the identity of the person engaging in the conduct as well as the method of location or creation of the images, search terms used, exchange, transfer, distribution, possession or origin of the files.  Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

17. "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, videos, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

18. Your Affiant knows from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address.  Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

19. Searching computer(s) for the evidence described in the attachment may require a range of data analysis techniques.  For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed.  Or, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names.  As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents.  Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant.  Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space.  This, too, makes it exceedingly likely that in this case it will be necessary to use a multitude of techniques, both on and off-scene, including more thorough techniques.

20. Based upon my knowledge, training and experience, I know that a thorough search for information stored in digital storage media requires a variety of techniques, that often includes both on-site seizure and search as well as a more thorough review off-site review in a controlled environment.  This variety of techniques is required, and often agents must seize most or all storage media to be searched on-scene and/or later in a controlled environment.  These techniques are often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

21. For example, the search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following on-site techniques (the following is a non-exclusive list, as other on-site search procedures may be used):

    A. On-site triage of computer systems to determine what, if any, peripheral devices or digital storage units have been connected to such computer systems, a preliminary scan of image files contained on such systems and digital storage devices to help identify any other relevant evidence or potential victims, and a scan for encryption software;

    B. On-site copying and analysis of volatile memory, which is usually lost if a computer is powered down, and may contain information about how the computer is being used, by whom, when, and may contain information about encryption, virtual machine software (virtual operating systems that are lost if the computer is powered down or encrypted),;

    C. On-site forensic imaging of any computers may be necessary for computers or devices that may be partially or fully encrypted, in order to preserve unencrypted electronic data that may, if not immediately imaged on-scene, become encrypted and accordingly unavailable for any examination.

22. The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include off-site techniques since it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined off-site and in a controlled environment.  This is true because of the following:

    A. The nature of evidence.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how, when and why a computer has been used, by whom, what it has been used for, requires considerable time, and taking that much time on premises could be unreasonable.  Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory may be essential to its complete and accurate analysis.  Searching for and attempting to recover any deleted, hidden, or encrypted data may be required to determine whether data falls within the list of items to be seized as set forth herein (for example, data that is encrypted and unreadable may not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of child exploitation offenses).

    B. The volume of evidence and time required for an examination.  Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names.  This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to

4

obtain evidence.  Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

C. Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

D. Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

E. Need to review evidence over time and to maintain entirety of evidence.  Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis. Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.  In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.  Your affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B.  In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation.  As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

23. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for permits both on-site seizing, imaging and searching and off-site imaging and searching of storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later and perhaps repeated examination consistent with the warrant.  The examination may require techniques, including but not limited

5

to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

24. Because several people may share the Subject Premises as a residence, it is possible that the Subject Premises will contain computers that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

25. I know that Subject Premises is decorated with flags and other memorabilia representing white supremacy. The investigation has also established that HOLZER has a roommate who has similar white supremacy ideology as HOLZER. I know from my training and experience that digital storage devices can be very large in capacity, yet very small in physical size. Additionally, I know from my training and experience that those who are in possession of such devices also tend to keep them on their persons, especially when they may contain contraband or other evidence of a crime. The storage capacity of such devices can be as large as tens of gigabytes in size as further described below, which allows for the storage of thousands of images and videos as well as other digital information such as calendars, contact lists, programs and text documents. Such storage devices can be smaller than a postage stamp in size, which allows them to be easily hidden in a person's pocket. Other individuals present during the execution of the search warrant, including HOLZER's roommate or others who share his white supremacy ideology, could hide evidence upon their persons to conceal the evidence from investigators during a search warrant. For these reasons, I request the ability to also search the persons of any individuals present at the Subject Premises during the execution of the warrant.

26. Information received from AT&T indicates Richard HOLZER's cell phone is a Motorola XT1921-2. Open source internet research on the features of this phone indicate it has a fingerprint recognition feature. I know in my training and experience that many cell phone users utilize the fingerprint recognition feature to unlock the device.

27. Similarly, in my training and experience I know that some applications loaded onto mobile devices or other electronic devices may be secured by the user with a thumbprint or fingerprint. Common among these types of applications are applications such as mobile banking apps or other financial applications, password storage applications, and secure communications apps, among others.

28. Due to the foregoing, I am informing the court that law enforcement intends to press the fingers (including thumbs) of Richard HOLZER to the device fingerprint sensor of the seized device, to the extent a visual inspection of those devices reveals that the device has a fingerprint sensor—located pursuant to the warrants requested by this Affidavit for the purpose of attempting to unlock the device via fingerprint sensor in order to search the contents (including applications) as authorized by this warrant.

29. Your Affiant knows from training and experience that search warrants of residences involved in computer or digitally related criminal activity usually produce items that tend to establish ownership or use of digital devices and ownership or use of any Internet service accounts accessed to commit the crimes described in this affidavit to include credit card bills, telephone bills, correspondence and other identification documents.

30. Your Affiant knows from training and experience that search warrants of residences usually reveal items that tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements and other identification documents.

## INVESTIGATION

31. The United States, including The Federal Bureau of Investigation (FBI) is conducting a criminal investigation of Richard R. HOLZER regarding possible violations of Title 18, United States Code, Section

247 (Damage To Religious Property; Obstruction Of Persons In The Free Exercise Of Religious Beliefs). The FBI has found evidence that Richard R. HOLZER is planning and/or advocating for violence in furtherance of white supremacy ideology.

32. RICHARD HOLZER is a 27-year-old male living in Pueblo, Colorado.  Facebook records show HOLZER to have used several Facebook accounts to promote white supremacy ideology and acts of violence, including racially-motivated acts of violence, in direct messages and group chats with other like-minded individuals.  For example:

    - On September 3, 2019, HOLZER told another Facebook user, "I wish the Holocaust really did happen…they need to die."

    - On August 27, 2019, HOLZER told another Facebook user, "I hate them with a passion.  I told this nasty Jew to fuck off or I'll kill him."

    - On July 17, 2019, HOLZER told another Facebook user, "I really, would like to go kill a bunch of Pedophiles and then die in a cop Shoot out."

    - On July 11, 2019, HOLZER sent the following Facebook message to another Facebook user, "getting ready to cap people."  The message included three pictures.  The first picture shows HOLZER in a kitchen dressed in clothing displaying white supremacy symbols while aiming a long gun.  The second picture shows HOLZER sitting with his back to a computer screen while holding a handgun in his right hand and a semiautomatic assault rifle in his left hand.  The third picture shows HOLZER in what appears to be the same room as the prior picture holding a handgun in each hand, with the barrel of the handgun in his left hand touching his temple.

    - On July 5, 2019, HOLZER told another Facebook user, "going to kill some spics…there's too many here (as expected) lol."

    - On May 12, 2019, HOLZER sent a video to another Facebook user in which HOLZER says ". . . I'm just going to get dead by suicide by cop, so literally if I'm going to cause a shootout just die in it."

33. On September 26, 2019, I reviewed a California Driver's License Photo of Richard HOLZER. On October 4, 2019, I conducted physical surveillance of HOLZER in Pueblo, Colorado. I observed HOLZER on numerous occasions during the surveillance and assess that the person observed is the same person in HOLZER's California Driver's License Photo.

34. Surveillance conducted by the FBI has determined that HOLZER resides at the Subject Premises.  The FBI has also received prospective location "ping" information from AT&T for HOLZER's phone since October 1, 2019, that corroborates HOLZER's residence.

35. HOLZER also sent the following Facebook messages indicating he resides at 1530 Wabash Avenue, Pueblo, CO 81004:
    - On September 15, 2019, HOLZER sent the following Facebook message to Facebook user Robert M. Herrera, "ok brother.  See you soon, I'll be at 1530 Wabash".  On 10/4/2019, HOLZER conducted surveillance of Temple Emanuel, 1325 N. Grand Avenue, Pueblo, CO, in preparation of planning an attack.  Surveillance conducted by the FBI on October 4, 2019 observed that Robert Herrera drove HOLZER to Temple Emanuel to perform the surveillance.

- On September 11, 2019, HOLZER told another Facebook user "…1530 Wabash Pueblo, CO 81004."

- On August 27, 2019, HOLZER sent the following message to a relative, "they need my birth certificate…please mail it to my new address I'm at 1530 Wabash Avenue, Pueblo, CO 81004".

Temple Emanuel

36. Temple Emanuel is a Synagogue serving a small congregation of Jewish families in Pueblo, Colorado. Its stated mission is to foster Jewish identity and ensure the survival of Judaism in a small community. Constructed in 1900, Temple Emanuel is the second-oldest synagogue in Colorado and is listed on the National Register of Historic Places.

FBI Online Covert Employee Contacts HOLZER

37. On September 28, 2019, an FBI Online Covert Employee ("OCE") initiated contact with Richard HOLZER through one of his Facebook accounts. The OCE's Facebook account portrays her[1] as a white female who is supportive of white supremacy ideology. She told HOLZER that Facebook suggested they be friends. HOLZER sent a picture of three buttons showing a swastika and two other symbols associated with white supremacy ideology. Shortly thereafter he sent pictures of himself wearing clothing with symbols and phrases associated with white supremacy. He stated that he lives in Colorado, used to be a member of the Ku Klux Klan (KKK), and is now a skinhead.

38. On September 28, 2019, HOLZER asked the OCE to contact one of his other Facebook accounts, from which HOLZER sent another picture of himself with images related to white supremacy. HOLZER sent a video of himself showing him putting on a mask, grabbing a machete and saying, "May the gods be with me for what I must do." In reference to that video, HOLZER stated, "I went after another pedophile. It's something that I've actually enjoyed doing is killing them." HOLZER also sent two pictures of himself with firearms, as well as pictures of himself and other individuals he identified as skinheads who report to him. HOLZER also sent a video of himself showing him holding a knife saying, "fuck antifa." HOLZER later sent a video of himself urinating on the front door of what appears to be a Jewish center.

39. On September 29, 2019, HOLZER volunteered to the OCE that he previously paid a Mexican cook to "hex and poison a local Synagogue." HOLZER stated that the cook put arsenic in the water pipes of the Synagogue on October 31, 2018.[2] HOLZER had previously recounted this incident to other individuals on Facebook. HOLZER explained that the man he paid was nicknamed "Mexican Hitler," and that he agreed to poison the Synagogue "for cheap" because he and HOLZER both do not like Jews. HOLZER stated to the OCE that he had gotten backlash from the "white movement" because he hired a Mexican to do the job, but said "What do they expect? You guys really want the Jews gone then sometimes you gotta improvise." HOLZER stated that he paid the cook $70. The OCE then asked HOLZER to "let me know when you have an activist event coming up," and HOLZER responded with two videos that HOLZER appeared to have filmed previously showing Temple Emanuel in Pueblo, Colorado.

40. On October 3, 2019, HOLZER messaged the OCE, "I'm getting ready for RAHOWA," meaning a racial holy war. When the OCE asked HOLZER to "message me after so we can talk about RAHOWA," HOLZER responded by sending a voice recording in which he explained he was going to Temple Emanuel "to scope it out."

---

[1] Gendered pronouns used for the OCE refer to the gender of the OCE's online persona. This affidavit intentionally makes no representations as to the gender of the employee him/herself.

[2] I am not aware of any evidence to corroborate HOLZER's claim that the cook put arsenic in the Synagogue's pipes.

8

41. On October 4, 2019, HOLZER told the OCE he was going to "[c]heck out the synagogue and see if any ants come out of the HILL." HOLZER sent OCE a video showing Nazi propaganda, knives, and masks. Later that day, HOLZER sent a video to the OCE showing a woman outside of Temple Emanuel. In the video, HOLZER can be heard saying, "Oh shit. So this would mean the kikes are fucking going back into business here and uh we'll have to fucking figure out what they're going to do." HOLZER then told the OCE that on October 31 he would again poison the Synagogue, possibly with arsenic. He invited the OCE to join him, and the OCE told him that she and some of her friends may be able to be there. HOLZER also listed some of his associates who he said may also be involved.

42. On October 10, 2019, the OCE told HOLZER that she had friends who would be in the area of Colorado Springs, Colorado, the following week. HOLZER expressed interest in meeting them.

43. On October 12, 2019, the OCE and HOLZER discussed HOLZER meeting with the OCE's friends the following week. HOLZER stated that he might bring a friend of his. HOLZER also stated that everyone would need to wear masks "when we do the synagogue" to hide their identities. HOLZER also stated he intended to "[g]o out with a final act for the movement."

FBI Under Cover Agents Contact with HOLZER

44. On October 12, 2019, an FBI undercover agent (UC-1) established contact with HOLZER, presenting himself as one of the friends the OCE mentioned to HOLZER. UC-1 told HOLZER that he and some friends planned to be in Colorado Springs, Colorado, the following week and they discussed meeting in person. HOLZER sent several pictures of himself with various images, paraphernalia, and clothing associated with white supremacy and Nazi ideology.

45. On October 13, 2019, HOLZER explained to UC-1 his plan to poison the synagogue in Pueblo on October 31, 2019. HOLZER continued to send images related to white supremacy and Nazi ideology. On October 15 and 16, 2019, HOLZER confirmed with UC-1 that he and his friend "Skeeter" would be able to meet that Thursday (October 17). On October 16, 2019, HOLZER sent a video of himself to UC-1 explaining that on October 31 they would wear masks when they poisoned the Synagogue with arsenic.

46. On October 17, 2019, three FBI undercover agents (UCs) met with HOLZER and his friend "Skeeter" at a restaurant in Colorado Springs, Colorado. HOLZER brought various white supremacy paraphernalia as gifts for the UCs, including a flag, several patches, a metal Thor's hammer, and a mask. Throughout the meeting HOLZER repeatedly expressed his hatred of Jewish people. HOLZER also stated that he believes in RAHOWA and explained RAHOWA is a Racial Holy War, based on the teachings of the church of the creator, founded by Matt Hale, who created that slogan to awaken white youth.

47. HOLZER recounted to the UCs that the year before, on October 31, a "witch doctor," whom HOLZER had paid $70, held a ritual in front of the synagogue in Pueblo and put arsenic in the water. HOLZER stated that the Synagogue was shut down for months after that and just recently reopened. HOLZER stated that people got sick from the arsenic and that he did not know if anyone died but he hoped so. HOLZER began talking about repeating the arsenic plan on October 31 of this year. He stated that his goal is to "make them know they're not wanted here." He stated that he wanted to shut the Synagogue down and condemn it. He then volunteered different ways to accomplish his goal, other than with arsenic. He mentioned welding the doors shut and said he would be willing to put together Molotov cocktails. HOLZER stated that he wanted to "vandalize the place beyond repair" and ideally force the city to tear down the building. HOLZER was the first person to mention the use of explosives during the meeting – he brought up Molotov cocktails in response to one of the UCs asking an open-ended question about what other methods he was considering. Regarding the use of explosives, HOLZER told

the UCs, "I'm as down as everybody else is . . . I want something that tells them they are not welcome in this town. Better get the fuck out, otherwise, people will die." HOLZER complained that when he visits the Synagogue, "I see these little kike kids and they have their little toys, they have their 'Jewla hoop' shaped like a star."

48. HOLZER, "Skeeter," and the UCs then drove to Pueblo, to visit Temple Emanuel. HOLZER observed that Molotov cocktails likely would not work because "simply busting out the windows is not gonna be enough." HOLZER and the UCs then discussed using pipe bombs. They discussed where they could place the pipe bombs, and HOLZER stated that he and "Skeeter" would go to the Synagogue when no one was there to try to determine where they could place explosives. The UCs offered to supply the pipe bombs, but cautioned that it would take some time because they would need to bring them in from out of state. HOLZER stated, "Let's get that place off the map." HOLZER also explained, "This is the big center here for them here in town. Thing is, why not hit the heart, right?" HOLZER said that he and "Skeeter" would come back when no one was around to further examine the building. HOLZER, "Skeeter," and the UCs then went to a nearby park and took a picture of themselves holding a white supremacy flag.

HOLZER'S Continued Communications with the Under Cover Agents

49. On October 19, 2019, HOLZER sent a video to UC-1 of HOLZER walking around the exterior of Temple Emanuel and commenting on various features of the building. Later that day, in a phone call, he told UC-1 that he wanted to put the Synagogue on the ground and demolish it. He also explained that the attack on the Synagogue would be "phase two" and that "phase three" would be outside of Pueblo and "bigger and better."

50. On October 19, 2019, in a group chat between HOLZER and the three UCs, one of the UCs (UC-2) said, "Let me know what you want the end result to look like and I'll get to work." On October 20, 2019, HOLZER responded with a picture of a church, half of which has crumbled to the ground, and stated, "Let's have it look something like that." HOLZER also sent a picture of an anti-Semitic caricature of a Jewish man.

51. On October 21, 2019, in the group chat, UC-2 stated that he was in the process of collecting supplies. HOLZER responded with a picture showing a Halloween mask and various white supremacy paraphernalia, including the book "Mein Kampf" and a flag or armband with a Nazi swastika. He wrote, "Everyone have a mask for "TRICK OR TREATING" followed by a skull and cross bones emoji, "If not, I got extras," and "Skeeter will need one and I'll hook him up."

52. On October 23, 2019, UC-2 sent two pictures to the group chat of what appear to be pipe bombs and the message "wanted to show you a little progress. Prepped several of these last night." HOLZER responded "Sieg Heil brothers." Later, HOLZER sent an audio file to the group chat relaying that he had talked to "Skeeter" and "he's absolutely elated about this, as am I. And I'm honored to be a part of history and, more importantly, the future of our folk. Heil."

53. On October 27, 2019, HOLZER sent an audio file to the group chat in which he stated "Hey guys, I'm in front of you know where. And the lights are on in the building and there's definitely movement in there. That means, like, literally they're definitely back in business. So it's a good thing we're going to do what we're going to do."

54. The FBI investigation has shown that HOLZER utilizes his cellular smartphone to communicate with the OCE and the UCs. Records from Facebook also indicate that HOLZER has accessed his Facebook account from public computers at a local library. Although the investigation has not shown HOLZER to utilize any other digital devices, I know from my training and experience that social media accounts,

10

55. such as those HOLZER has utilized to communicate with the OCE and the UCs can be accessed from multiple devices.

55. I also know from my training and experience that people who plan in advance to commit a criminal act sometimes plan their crimes at their residences, leaving behind evidence such as written materials and computer files containing details of their plans.

56. HOLZER and the UCs have agreed to meet after HOLZER finishes work at approximately 8pm on November 1, 2019, to inspect the explosives and finalize the plan to attack the Synagogue that night. The FBI anticipates executing this search warrant while HOLZER is away from the Subject Premises that evening. In my training and experience, individuals who plan in advance to commit a criminal act sometimes leave behind their cell phones on the day they intend to commit their crime as an evasive measure so that their phone cannot be tracked or located at the crime scene. In this case, HOLZER has discussed using evasive measures on November 1, 2019, such as falsifying a time card at work to give himself an alibi.

## REQUEST FOR AUTHORIZATION TO EXECUTE WARRANT AT ANY TIME IN THE DAY OR NIGHT

57. I request authorization to execute the search warrant any time in the day or night in order to ensure the safety of law enforcement personnel who will be conducting the search, as well as to protect against destruction of evidence. Due to information that HOLZER has possessed numerous firearms and other weapons, the FBI plans to execute the warrant while HOLZER is away from the Subject Premises, ideally while HOLZER is meeting with the UCs on the evening of November 1, 2019, or immediately thereafter. As discussed above, that meeting is expected to occur sometime after 8pm. The FBI also anticipates arresting HOLZER that night. Because HOLZER has a roommate, as well as other associates in the vicinity, executing the warrant before HOLZER has an opportunity to alert anyone to his arrest will also protect against destruction of evidence. Accordingly, I respectfully submit that good cause has been shown and request authorization to execute this warrant any time in the day or night.

## **CONCLUSION**

58. Based on the investigation described above, probable cause exists to believe that at the residence located at the place described in Attachment A, will be found evidence, fruits, and instrumentalities of a violation of Title 18, United States Code, Section 247 (Damage To Religious Property; Obstruction Of Persons In The Free Exercise Of Religious Beliefs) (described on Attachment B).

59. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

*s/ John W. Smith*
John W. Smith, Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN before me this __1st__ day of November 2019

_____
UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by Julia Martinez, Assistant United States Attorney.